Elaine A. Ryan (AZ Bar #012870)
Carrie A. Laliberte (AZ Bar #032556)
BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
2325 E. Camelback Rd., Suite 300
Phoenix AZ 85016
Telephone:    (602) 274-1100
Email:        eryan@bffb.com
              claliberte@bffb.com

Patricia N. Syverson (AZ Bar #020191)
BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
600 W. Broadway, Suite 900
San Diego, California 92101
Telephone:    (619) 798-4593
Email:        psyverson@bffb.com

*As local counsel on behalf of:*

John A. Yanchunis (*To Be Admitted Pro Hac Vice*)
Patrick A. Barthle (*To Be Admitted Pro Hac Vice*)
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone:    (813) 223-5505
Email:        jyanchunis@forthepeople.com
              pbarthle@forthepeople.com

Counsel for Plaintiffs and the Putative Class
[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA
## PHOENIX DIVISION

| | |
|---|---|
| Daniel Ranson, Mitchell Flanders, Joseph Rivera, And Teresa Culberson on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> Magellan Health, Inc., <br><br> Defendant. | **Case No.:** <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Daniel Ranson, Mitchell Flanders, Joseph Rivera, and Teresa Culberson, by and through their undersigned counsel, bring this class action lawsuit against Defendant Magellan Health, Inc. ("Magellan") on behalf of themselves and all others similarly situated, and allege, based upon information and belief and the investigation of their counsel as follows:

## INTRODUCTION

1.      Incorporated in 1969 in Delaware, Magellan is a large healthcare company that provides managed care services for health plans and other organizations, employers, various military and governmental agencies and third-party administrators throughout the United States and Europe.

2.      As of December 31, 2019, Magellan employed approximately 10,100 full-time and part-time employees.

3.      On or about May 4, 2020, Magellan notified its current and former employees and providers that someone within the company had fallen for a phishing scheme in which an unauthorized actor impersonated a Magellan client.  According to the Notice, that attempt occurred on April 6, 2020.

4.      According to the Notice, a single e-mail account had been compromised which resulted in a ransomware attack.  Just prior to the launch of that, however, the unauthorized actor managed to exfiltrate data from a Magellan server. Among the data that was exposed and taken was personally identifiable information ("PII"), including names, addresses, employees' ID numbers, and W-2 and 1099 details (including Social Security numbers, and Taxpayer ID numbers). The hacker also used a piece of malware that stole the login credentials, including usernames and passwords, of Magellan's current employees.

5.      This Notice was the second such announcement of a data breach communicated by Magellan in the last six months.

6.    The prior breach was the subject of a November 8, 2019 notification to some 44,000 beneficiaries of the State of Tennessee's Medicaid program, TennCare.  In that breach, data was exfiltrated following a similar phishing attack that also resulted in the disclosure of PII and protected health information ("PHI"), including patient names, Social Security numbers, health plan numbers, and names of various health plans and drug names associated with Magellan Rx members.

7.    Fully aware of its inadequate cybersecurity procedures and protocols as a result of the prior breach, this latest breach was a direct result of Magellan's continued failure to implement adequate and reasonable cybersecurity procedures and protocols among its employees to protect sensitive and valuable PII that is maintained not only on employees but also providers associated with various Magellan subsidiaries.

8.    Beginning on or about June 12, 2020, Magellan further began to notify more than an additional 360,000 individuals associated with a growing number of Magellan subsidiaries and contracted health plans that their PII and PHI was exfiltrated during the April 2020 breach.

9.    It is clear that with all of these breaches that Magellan has disregarded the rights of Plaintiffs and Class members (defined below) by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that Magellan did not have adequately robust computer systems and security practices to safeguard PII and PHI; failing to take standard and reasonably available steps to prevent the Data Breach; failing to monitor and timely detect the Data Breach; and failing to provide Plaintiffs and Class members with prompt and accurate notice of the Data Breach.

10.    As a result of Defendant's failure to implement and follow basic security procedures, PII and PHI is now in the hands of thieves. Plaintiffs and Class

members have had to spend, and will continue to spend, significant amounts of time and money in an effort to protect themselves from the adverse ramifications of the Data Breach and will forever be at a heightened risk of identity theft and fraud.

11.    Plaintiffs, on behalf of all others similarly situated, allege claims for negligence, breach of implied contract, unjust enrichment and violations of the Arizona Consumer Fraud Act, and seek to compel the Defendant to adopt reasonably sufficient security practices to safeguard PII and PHI that remains in its custody in order to prevent incidents like the Data Breach from reoccurring in the future.

**PARTIES**

12.    Plaintiff Daniel Ranson is a citizen and resident of California.  Plaintiff Ranson is a licensed clinical social worker in California and currently practices as a psychotherapist in Mammoth Lakes, California.  At the time of the Data Breach, Plaintiff had contracted with Magellan to treat behavioral health patients with Human Affairs International of California ("HAIC"), a wholly owned subsidiary of Magellan Healthcare, Inc., which serves as a mental health service administrator ("MHSA") for Blue Shield of California, Blue Shield Life & Health Insurance Company, and other health plans.  Plaintiff Ranson received written notice of the Data Breach, and a true and correct copy of that Notice is attached hereto as Exhibit "A".

13.    As an MHSA, Magellan manages healthcare services for approximately 40 million members nationwide, which includes the offering of provider networks, such as the one in which Plaintiff Ranson is included.

14.    Plaintiff Mitchell Flanders is a citizen and resident of Virginia.  In 2018, Plaintiff Flanders worked as an intern for Magellan Federal (formerly the Armed Forces Services Corporation), another Magellan subsidiary, prior to being promoted to a full-time position, where he worked until his resignation from the company in 2019.  He is currently unaffiliated with Magellan. Plaintiff Flanders

received written notice of the Data Breach, and a true and correct copy of that Notice is attached hereto as Exhibit "B".

15.    Plaintiff Joseph Rivera is a citizen and resident of Wisconsin.  Plaintiff Rivera was employed by Abbott Laboratories from May 2001 through May 2012.  In 2012, Abbott Laboratories split into two divisions and Plaintiff Rivera became an employee of Abvie and continues to be employed with Abvie presently.   During the time that Plaintiff Rivera was employed by Abbot Laboratories (May 2001-May 2012), Defendant Magellan Health, Inc. administered Abbott Laboratories' health care plan in which he was a participant. Plaintiff Rivera received written notice of the Data Breach by letter dated June 18, 2020, and a true and correct copy of that Notice Letter is attached hereto as Exhibit "C".

16.    Plaintiff Teresa Culberson is a citizen and resident of Tennessee. Plaintiff Culberson was an insured under Magellan's Rx Medicare program. On or about June 15, 2020, Plaintiff Culberson received a letter from Magellan notifying her that her information was compromised as the result of an April 11, 2020 data breach at Magellan, and a true and correct copy of that Notice Letter is attached hereto as Exhibit "D".

17.    Defendant Magellan Health, Inc. is a publicly traded Delaware corporation headquartered at 4801 E. Washington Street, Phoenix, Arizona 85034. It operates three segments with various wholly owned subsidiaries, including but not limited to, HAIC and Magellan Federal.

**JURISDICTION AND VENUE**

18.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are at least 360,000 putative Class members, most of whom have different citizenship from Magellan.

19.    This Court has jurisdiction over Defendant, which operates and is headquartered in this District. The computer systems implicated in this Data Breach are also likely based in this District. Through its business operations in this District, Magellan and its related subsidiaries intentionally avail themselves of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

20.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events and omissions giving rise to this action occurred in this District. Defendant is headquartered in this District, maintains sensitive PII on its current and former employees here, and has caused harm to Plaintiffs and Class members, some of whom reside in this District.

## STATEMENT OF FACTS

### A. The Data Breach

21.    On or about April 6, 2020, an unauthorized person gained access to an employee's e-mail by impersonating a client of Magellan.  That access led to a ransomware attack that allowed the person to gain access to sensitive data and extract such from a Magellan server.

22.    The stolen data included PII, including names, addresses, employees' ID numbers, and W-2 and 1099 details (including Social Security numbers, and Taxpayer ID numbers) of current and former employees and Magellan providers.

23.    This was the second such data breach to occur at Magellan within the last year, with notices of the breaches only surfacing within the last six months.

24.    The first breach occurred on May 28, 2019, again after an unauthorized third party had gained access to an employee email account through a commonplace phishing attack.  That breach resulted in the exposure of sensitive patient PHI and PII, including patient names, Social Security numbers, health plan member ID numbers, health plan names, provider information, and prescription drug names.

25.     Magellan did not notify individuals affected by the first breach until November of 2019.  A related class action concerning that breach has been filed by Plaintiffs' Counsel in this District, *Dearing v. Magellan Health, Inc., et al.*, 2:20-cv-0-0747-SPL.

26.     The Notice of the most recent breach sent by Magellan to Plaintiff Ranson stated, in relevant part:

> May 15, 2020
>
> Magellan was recently the victim of a criminal ransomware attack. We are writing to let you know how this incident may have affected your personal information and, as a precaution, to provide steps you can take to help protect your information. We take the privacy and security of your personal information very seriously and we sincerely regret any concern this accident may cause you.
>
> **What happened**
>
> On April 11, 2020, Magellan discovered it was targeted by a ransomware attack. The unauthorized actor gained access to Magellan's systems after sending a phishing email on April 6 that impersonated a Magellan client. Once the incident was discovered, Magellan immediately retained a leading cybersecurity forensics firm, Mandiant, to help conduct a thorough investigation of the incident. The investigation revealed that prior to the launch of the ransomware, the unauthorized actor exfiltrated a subset of data from a single Magellan corporate server, which included some of your personal information. In limited instances, and only with respect to certain current employees, the unauthorized actor also used a piece of malware designed to steal login credentials and passwords. At this point, we are not aware of any fraud or misuse of any of your personal information as a result of this incident, but we are notifying you out of an abundance of caution.
>
> **What information was involved**
>
> The exfiltrated records include personal information such as name, address, employee ID number, and W-2 or 1099

details such as Social Security number or Taxpayer ID number and, in limited circumstances, may also include usernames and passwords.

**What we are doing**

Magellan immediately reported the incident to, and is working closely with, the appropriate law enforcement authorities, including the FBI. Additionally, to help prevent a similar type of incident from occurring in the future, we implemented additional security protocols designed to protect our network, email environment, systems, and personal information.

. . . .

**For more information**

The security of your personal information personal information is important to us and we sincerely regret that this incident occurred. For more information, or if you have any questions or need additional information, please contact 855 – 252 – 3244.

Sincerely,

John J. DiBernardi Jr., Esq.
Senior Vice President & Chief Compliance Officer

27.    The e-mail Notice received by Plaintiff Flanders, also from Mr. DiBernardi stated, in relevant part:

Dear Former Magellan Health Employee:

At Magellan Health, we take privacy and information security very seriously, which is why we want to share with you some information regarding a recent ransomware attack against the company.

While we have been remediating and investigating this attack, we recently learned that the threat actor responsible for this ransomware attack on Magellan also stole

documents containing W-2 information for all Magellan Health employees who were employed in 2019, which includes Social Security numbers.

It is important to note we have no reason to believe any of your information has been used inappropriately. In fact, we do not believe your W-2 information was targeted by the threat actor for identity theft purposes, but rather, such information happened to be included in documents taken by the threat actor as part of the ransomware attack. Nonetheless, we wanted to inform you about this immediately, so you could take steps to protect yourself in an abundance of caution.

To that end, we are offering you free identity theft monitoring services through Experian. This service will include free credit monitoring from the three national credit bureaus and identity restoration services. We are also contacting the IRS to inform them of the W-2 theft so that they can monitor tax filings.

In the coming days you will receive a letter from Experian, which will provide further details on the situation. This letter will also include information on the steps you can take, including how to set up the identity protection services being offered to you at no cost to help protect you from potential identity theft, as well as additional precautionary measures you can take.

If you wish to take any immediate precautionary action before receiving our offered identity theft monitoring services, you may place a fraud alert or credit freeze on your credit file through any of the three credit bureaus and receive a credit report for your review free of charge:

- Equifax: Equifax.com or 1-800-685-1111
- Experian: Experian.com or 1-888-397-3742
- TransUnion: TransUnion.com or 1-888-909-8872

> We apologize for any inconvenience this matter might cause you and thank you for your patience and understanding while we work through this issue.

28.    The notice received by Plaintiff Rivera was similar to those received by Plaintiffs Ranson and Flanders, except that it noted "[b]etween 2004 and 2011, Magellan assisted Abbott Laboratories ("Abbott") with the administration and management" of Abbott's health plan.  See Exh. C.  According to the notice, Magellan stopped providing those services to Abbott on December 31, 2011, yet amazingly continued to store Plaintiff Rivera's PII and PHI in the form of a ten-year-old Excel spreadsheet from 2009 – far exceeding any reasonably necessary time period to store such data for former plan members.

29.    The notice received by Plaintiff Culberson is more succinct than the others, but still conveys similar information and contains an offer to provide her with "identity restoration services by Experian."  See Exh. D.

## B.  Magellan's Obligations to Keep PII and PHI Secure

30.    Due to its business and operations, Magellan is obligated by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") to comply with a series of administrative, physical security, and technical security requirements in order to protect sensitive patient information. Among other things, the law mandates Magellan develop, publish, and adhere to a privacy practice.

31.    As such, Magellan recognizes its obligations under HIPAA to safeguard and protect patient PHI and PII.  It is well known that healthcare organizations have been the target of an increasing number of cyberattacks and must take adequate and reasonable steps to protect their systems from attack, regardless of who the intended or incidental victims are.

32.    These obligations also extend to Magellan employees, as the company has an established Privacy Policy that details the types of PII and PHI Magellan

collects from its employees, providers and patients, among others.[1]   Additionally, under various federal and state laws, regulations, industry practices, and common law, Magellan is bound to safeguard and protect the personal data of its employees, providers, and patients from unauthorized disclosure to third parties.

### C.  Prevalence of Cyberattacks and Susceptibility of the Healthcare Sector

33.     Cyberattacks come in many forms. Phishing attacks are among the oldest, most common, and well known.  In simple terms, phishing is a method of obtaining personal information using deceptive e-mails and websites. The goal is to trick an e-mail recipient into believing that the message is something they want or need from a legitimate or trustworthy source and to subsequently take an action such as clicking on a link or downloading an attachment. The fake link will typically mimic a familiar website and require the input of credentials. Once input, the credentials are then used to gain unauthorized access into a system.  "It's one of the oldest types of cyberattacks, dating back to the 1990s" and one that every organization with an internet presence is aware of.[2] It remains the "simplest kind of cyberattack and, at the same time, the most dangerous and effective."[3]

34.     Phishing attacks are well known and understood by the cyberprotection community and are generally preventable with the implementation of a variety of

---

[1]                               https://www.magellanhealth.com/privacy-policy/#:~:text=Magellan%20uses%20physical%2C%20technical%2C%20and,for%20providing%20service%20to%20you. (last visited July 2, 2020).

[2] What is phishing? How this cyber attack works and how to prevent it, CSO Online, February 20, 2020, https://www.csoonline.com/article/2117843/what-is-phishing-how-this-cyber-attack-works-and-how-to-prevent-it.html (last visited July 2, 2020).

[3] *Phishing*, Malwarebytes, https://www.malwarebytes.com/phishing/ (last visited July 2, 2020).

proactive measures such as sandboxing inbound e-mail[4], inspecting and analyzing web traffic, penetration testing[5], and employee education, among others.

35.    In 2016, the number of U.S. data breaches surpassed 1,000, a record high and a 40% increase in the number of data breaches from the previous year.[6]  In 2017, a new record high of 1,579 breaches were reported, representing a 44.7% increase over 2016.[7]

36.    In 2018, the healthcare sector reported the second largest number of breaches among all measured sectors and the highest rate of exposure per breach.[8] Healthcare related data is among the most sensitive and personally consequential when compromised. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident…came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for health

---

[4] Sandboxing is an automated process whereby e-mail with attachments and links are segregated to an isolated test environment, or a "sandbox," wherein a suspicious file or URL may be executed safely.

[5] Penetration testing is the practice of testing a computer system, network, or web application to find security vulnerabilities that an attacker could exploit. The main objective of penetration testing is to identify security weaknesses. Penetration testing can also be used to test an organization's security policy, its adherence to compliance requirements, its employees' security awareness and the organization's ability to identify and respond to security incident. The primary goal of a penetration test is to identify weak spots in an organization's security posture, as well as measure the compliance of its security policy, test the staff's awareness of security issues and determine whether -- and how -- the organization would be subject to security disasters.    *See*  https://searchsecurity.techtarget.com/definition/penetration-testing (last visited July 2, 2020).

[6] Identity Theft Resource Center, *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout* (Jan. 19, 2017), *available at* https://www.idtheftcenter.org/surveys-studys (last visited July 2, 2020).

[7] Identity Theft Resource Center, 2017 Annual Data Breach Year-End Review, available at https://www.idtheftcenter.org/2017-data-breaches/ (last visited July 2, 2020).

[8] Identity Theft Resource Center, 2018 End-of-Year Data Breach Report, *available at* https://www.idtheftcenter.org/2018-data-breaches/ (last visited July 2, 2020).

care they did not receive in order to restore coverage.[9]  Almost 50% of the victims lost their health care coverage as a result of the incident, while nearly one-third said their insurance premiums went up after the event. 40% of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[10]

37.    Healthcare related data breaches have continued to rapidly increase. According to the 2019 HIMSS Cybersecurity Survey, 82% of participating hospital information security leaders reported having a significant security incident in the last 12 months, with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[11] "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[12]

38.    Indeed, the HIPAA Journal 2019 Healthcare Data Breach Report demonstrates an upward trend in health sector data breaches over the past 10 years, with 2019 reflecting more data breaches than any other year.[13] 2019 represented a

---

[9] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET, March 3, 2010,        https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last visited July 2, 2020).

[10] *Id.*

[11] HIMSS, 2019 HIMSS Cybersecurity Survey, https://www.himss.org/himss-cybersecurity-survey (last visited April 13, 2020).

[12] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, available at https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last visited July 2, 2020).

[13] HIPAA Journal, Healthcare Data Breach Statistics, https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last visited July 2, 2020).

37.4% increase over breaches reported in 2018 with a total number of patient records exposed increasing from 13,947,909 in 2018 to 41,335,889.[14]

39.　"Shockingly, the report disclosed that in 2019 alone, the healthcare records of 12.55% of the population of the United States were exposed, impermissibly disclosed, or stolen."[15]

40.　As a healthcare services provider, Magellan knew, or should have known, the importance of safeguarding patient PHI and PII entrusted to it and of the foreseeable consequences if its data security systems were breached, including the significant costs that would be imposed on its employees, providers, and patients as a result of a breach.  But Magellan failed to take adequate cybersecurity measures to prevent the Data Breach from occurring.

### D. Magellan Acquires, Collects, and Stores Plaintiffs' and Class Members' PII and PHI

41.　Magellan acquires, collects, and stores a massive amount of protected health related information and other personally identifiable data on its employees, providers and patients.

42.　By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class members' PII, Magellan assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class members' PII and PHI from unauthorized disclosure.

43.　Plaintiffs and Class members have taken reasonable steps to maintain the confidentiality of their PII and PHI. Plaintiffs and Class members relied on

---

[14] *2019 Healthcare Data Breach Report*, HIPAA Journal. https://www.hipaajournal.com/2019-healthcare-data-breach-report/ (last visited July 2, 2020).

[15] *Report Reveals Worst State for Healthcare Data Breaches in 2019*, Info Security Group, February 14, 2020, https://www.infosecurity-magazine.com/news/report-healthcare-data-breaches-in/ (last visited July 2, 2020).

Magellan to keep their PII and PHI confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### E. The Value of PII and the Effects of Unauthorized Disclosure

44.    Magellan was well-aware that the PII and PHI it collects and maintains on employees, providers and patients is highly sensitive, and of significant value to those who would use it for wrongful purposes.

45.    PII is a valuable commodity to identity thieves.  As the FTC recognizes, identity thieves can commit an array of crimes including identify theft, medical fraud, and financial fraud.[16] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII on multiple underground Internet websites.

46.    While credit card information can sell for as little as $1-$2 on the black market, other more sensitive information can sell for as much as $363 according to the Infosec Institute. PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

47.    For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security Number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used

---

[16] Federal Trade Commission, *Warning Signs of Identity Theft*, https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited July 2, 2020).

1   to file for unemployment benefits until law enforcement notifies the individual's
2   employer of the suspected fraud. Fraudulent tax returns are typically discovered only
3   when an individual's authentic tax return is rejected.

4       48.     Moreover, it is not an easy task to change or cancel a stolen Social
5   Security Number. An individual cannot obtain a new Social Security Number
6   without significant paperwork and evidence of actual misuse. Even then, a new
7   Social Security Number may not be effective, as "[t]he credit bureaus and banks are
8   able to link the new number very quickly to the old number, so all of that old bad
9   information is quickly inherited into the new Social Security number."[17]

10      49.     This data, as one would expect, demands a much higher price on the
11  black market. Martin Walter, senior director at cybersecurity firm RedSeal,
12  explained, "[c]ompared to credit card information, personally identifiable
13  information and Social Security numbers are worth more than 10x on the black
14  market."[18]   As explained above, the inclusion of PHI, such as the information
15  exposed here, is even more valuable.

16      50.     At all relevant times, Magellan knew, or reasonably should have
17  known, of the importance of safeguarding PII and of the foreseeable consequences
18  if its data security systems were breached, including the significant costs that would
19  be imposed on employees and providers as a result of a breach.

20  //

21  //

22

23

24  [17] *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR,
    Brian       Naylor,       Feb.       9,       2015,       *available       at*
25  http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-
    millions-worrying-about-identity-theft (last visited July 2, 2020).

26  [18] *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card
    Numbers*,   IT   World,   Tim   Greene,   Feb.   6,   2015,   *available   at*
27  http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-
    for-10x-price-of-stolen-credit-card-numbers.html (last visited July 2, 2020).

28

### F. Magellan Failed to Comply with FTC Guidelines

51.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[19]

52.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[20] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

53.     The FTC further recommends that companies not maintain PHI and PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[21]

54.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to

---

[19]Federal    Trade    Commission,    *Start    With    Security*,    *available    at* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited July 2, 2020).

[20] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*,    *available    at*    https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited July 2, 2020).

[21] FTC, *Start With Security*, *supra* note 23.

employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

55.    Magellan failed to properly implement basic data security practices. Magellan's failure to employ reasonable and appropriate measures to protect against unauthorized access to PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

56.    Magellan was at all times fully aware of its obligation to protect the PII of employees, providers and patients because of its position as an employer, contractor and healthcare provider.  Magellan was also aware of the significant repercussions that would result from its failure to do so.

### G. Magellan Failed to Comply with Industry Standards

57.    Data exfiltrated from healthcare providers continues to be a high value target among cybercriminals.  This is true whether the data maintained by providers relates to patients or their providers or their own employees.  In 2017, the U.S. healthcare sector experienced over 330 data breaches, a number which continued to grow in 2018 (363 breaches).[22] The costs of healthcare data breaches are among the highest across all industries, topping $380 per stolen record in 2017 as compared to the global average of $141 per record.[23] As a result, both the government and private sector have developed industry best standards to address this growing problem.

---

[22]   https://www.ntiva.com/blog/10-cybersecurity-best-practices-for-the-healthcare-industry; Identity Theft Resource Center, 2018 End of Year Data Brach Report, https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf (last visited July 2, 2020).

[23] *Id.*

58.    The Department of Health and Human Services' Office for Civil Rights ("DHHS") notes that "[w]hile all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry. Hackers are actively targeting healthcare organizations as they store large quantities of highly sensitive and valuable data."[24]    DHHS highlights several basic cybersecurity safeguards that can be implemented to improve cyber resilience which require a relatively small financial investment, yet can have a major impact on an organization's cybersecurity posture including: (a) the proper encryption of PHI and PII; (b) educating and training healthcare employees on how to protect PHI and PII; and (c) correcting the configuration of software and network devices.

59.    Private cybersecurity firms have also identified the healthcare sector as being particularly vulnerable to cyberattacks, both because of the value of the individuals' PHI and PII they maintain and because as an industry they have been slow to adapt and respond to cybersecurity threats.[25] They too have promulgated similar best practices for bolstering cybersecurity and protecting against the unauthorized disclosure of PHI and PII.

60.    Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, Magellan chose to ignore them. These best practices were known, or should have been known by Magellan, whose failure to heed and properly implement them directly led to the Data Breach and the unlawful exposure of PII and PHI.

---

[24] *Cybersecurity Best Practices for Healthcare Organizations*, HIPAA Journal, November 1, 2018, https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/ (last visited July 2, 2020).

[25] *See, e.g.,* https://www.ntiva.com/blog/10-cybersecurity-best-practices-for-the-healthcare-industry; https://resources.infosecinstitute.com/category/healthcare-information-security/is-best-practices-for-healthcare/10-best-practices-for-healthcare-security/#gref (last visited July 2, 2020).

*H. Plaintiffs and Class Members Suffered Damages*

61.     The ramifications of Defendant's failure to keep employees' and providers' PII and PHI secure are long lasting and severe.  Once stolen, fraudulent use of such information and damage to victims may continue for years. Consumer victims of data breaches are more likely to become victims of identity fraud.[26]

62.     The PII and PHI belonging to Plaintiffs and Class members is private, sensitive in nature, and was left inadequately protected by Defendant, who did not obtain Plaintiffs' or Class members' consent to disclose such information to any other person as required by applicable law and industry standards.

63.     Upon receiving the Notice, Plaintiffs immediately took action to investigate whether the breach resulted in any fraud to them.  Plaintiff Flanders learned that his data had indeed been offered for sale recently on the "Dark Web." Each Plaintiff contacted their creditors and reviewed their credit reports to determine if any fraudulent charges or activity appeared.  Each continues to monitor their credit reports and to undertake additional safeguards such as requesting new credit cards, changing passwords, etc.

64.     Each Plaintiffs has spent and continues to spend their valuable time to protect the integrity of their personal information, finances, and credit—time which they would not have had to expend but for the Data Breach.

65.     Plaintiffs and Class members have suffered actual injuries from having their PII and PHI exposed as a result of the Data Breach, including, but not limited to: (a) damages resulting from taking the time to search for fraudulent activity; to change banks, bank accounts and debit and credit cards; to purchase credit monitoring and identity theft protection; to call their creditors to provide them with

---

[26]    2014    LexisNexis    True    Cost    of    Fraud    Study, https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf    (last visited July 2, 2020).

notice of the breach; and to otherwise attempt to protect their financial accounts; (b) damages to and diminution in the value of their PII—a form of intangible property that the Plaintiffs entrusted to Magellan as a condition of employment and the provision of services to patients; and (c) imminent and impending injury arising from the increased risk of fraud and identity theft.

66.    As a result of the Data Breach, Plaintiffs and Class members will continue to be at heightened risk for financial fraud, medical fraud, identity theft, and attendant damages for years to come.

67.    The Data Breach was a direct and proximate result of Magellan's failure to: (a) properly safeguard and protect Plaintiffs' and Class members' PII and PHI from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class members' PII and PHI; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

68.    Defendant had the resources necessary to prevent the Data Breach, but neglected to adequately invest in data security measures, despite its obligations to protect PII and PHI.  Had Defendant remedied the deficiencies in its data security systems and adopted security measures recommended by experts in the field, it would have prevented the intrusions into its systems and, ultimately, the theft of PII and PHI.

69.    As a direct and proximate result of Defendant's wrongful actions and inactions, Plaintiffs and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives. The U.S. Department of Justice's Bureau of Justice

Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[27]

70.     To date, Magellan has offered inadequate identity monitoring services to affected individuals given the type of data stolen.  They are wholly inadequate as they fail to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud and they entirely fail to provide any compensation for the unauthorized release and disclosure of Plaintiffs' and Class members' PII and PHI.

71.     As a result of the Defendant's failures to prevent the Data Breach, Plaintiffs and Class members have suffered, will suffer, or are at increased risk of suffering:

      a.  The compromise, publication, theft, and/or unauthorized use of their PII and PHI;

      b.  Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

      c.  Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

---

[27] U.S. Department of Justice, Office of Justice Programs Bureau of Justice Statistics, *Victims of Identity Theft, 2012*, December 2013 available at https://www.bjs.gov/content/pub/pdf/vit12.pdf (last visited July 2, 2020).

d.  The continued risk to their PII and PHI, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake appropriate measures to protect the PII and PHI in its possession; and

e.  Current and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, remediate, and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and Class members.

72.    In addition to a remedy for the economic harm, Plaintiffs and Class members maintain an undeniable interest in ensuring that their PII and PHI are secure, remain secure, and are not subject to further misappropriation and theft.

## CLASS ACTION ALLEGATIONS

73.    Plaintiffs seek relief on behalf of themselves and as representatives of all others who are similarly situated. Pursuant to Fed. R. Civ. P. Rule 23(a), (b)(2), (b)(3) and (c)(4), Plaintiffs seek certification of a Nationwide class defined as follows:

> All persons whose PII and PHI was compromised as a result of the Data Breach announced by Magellan beginning on or about April 6, 2020 (the "Class").

74.    Excluded from the Class are Magellan and any of its affiliates, parents or subsidiaries; all persons who make a timely election to be excluded from the Class; government entities; and the judges to whom this case is assigned, their immediate families, and court staff.

75.     Plaintiffs hereby reserve the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct discovery.

76.    The proposed Class meets the criteria for certification under Rule 23(a), (b)(2), (b)(3) and (c)(4).

77.     **Numerosity. Fed. R. Civ. P. 23(a)(1).**  Consistent with Rule 23(a)(1), the members of the Class are so numerous that the joinder of all members is impractical.   The Data Breach implicates approximately 10,500 Magellan employees, both current and former, as well as a potentially unknown number of Magellan providers and other individuals.

78.     **Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).**  Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class members. The common questions include:

a.  Whether Magellan had a duty to protect its employees', providers' and patients' sensitive PII and PHI;

b.  Whether Magellan knew or should have known of the susceptibility of its systems to a data breach;

c.  Whether Magellan's security measures to protect its systems were reasonable in light of best practices recommended by data security experts;

d.  Whether Magellan was negligent in failing to implement reasonable and adequate security procedures and practices;

e.  Whether Magellan's failure to implement adequate data security measures allowed the breach of its data systems to occur;

f.  Whether Magellan's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its systems, resulting in the unlawful exposure of the Plaintiffs' and Class members' PII and PHI;

g.  Whether Plaintiffs and Class members were injured and suffered damages or other losses because of Magellan's failure to reasonably protect its systems and data network; and,

h.  Whether Plaintiffs and Class members are entitled to relief.

79.  **Typicality. Fed. R. Civ. P. 23(a)(3).**  Consistent with Rule 23(a)(3), Plaintiffs' claims are typical of those of other Class members.  Plaintiffs were former and current employees of various Magellan entities, providers and other persons believed to work on a 1099 basis with a Magellan entity – all of whom had their PII exposed in the Data Breach and members of various health plans serviced by Magellan. Plaintiffs' damages and injuries are akin to other Class members, and Plaintiffs seek relief consistent with the relief sought by the Class.

80.  **Adequacy. Fed. R. Civ. P. 23(a)(4).**  Consistent with Rule 23(a)(4), Plaintiffs are adequate representatives of the Class because they are members of the Class they seek to represent; are committed to pursuing this matter against Magellan to obtain relief for the Class; and have no conflicts of interest with the Class. Moreover, Plaintiffs' attorneys are competent and experienced in litigating class actions, including privacy litigation of this kind. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Class' interests.

81.  **Superiority. Fed. R. Civ. P. 23(b)(3).**  Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Magellan, and thus, individual litigation to redress Magellan's wrongful

conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

82.    **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

83.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.  Such particular issues include, but are not limited to:

      a.  Whether Magellan owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their PII and PHI;

      b.  Whether Magellan's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

      c.  Whether Magellan's failure to institute adequate protective security measures amounted to negligence;

      d.  Whether Magellan failed to take commercially reasonable steps to safeguard employee, provider and patient PII and PHI;

      e.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the data breach; and

f.  Whether Magellan failed to comply with its statutory and regulatory obligations.

84.    Finally, all members of the proposed Class are readily ascertainable. Magellan has access to its employees', providers' and patients' names and addresses affected by the Data Breach. Using this information, Class members can be identified and ascertained for the purpose of providing notice.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE**

85.    Plaintiffs restate, reallege and incorporate by reference all preceding paragraphs, as if fully set forth herein.

86.    As a condition of employment, of receiving employment benefits or of contracting with Magellan and its subsidiaries, and/or receiving health plan benefits, Plaintiffs and Class members were obligated to provide Magellan with their PII and PHI.

87.    Plaintiffs and the Class members entrusted their PII and PHI to Magellan with the understanding that Magellan would safeguard their information.

88.    Defendant had full knowledge of the sensitivity of the PII and PHI and the types of harm that Plaintiffs and Class members could and would suffer if that information was wrongfully disclosed.

89.    Defendant had a duty to exercise reasonable care in safeguarding, securing and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.  This duty includes, among other things, designing, maintaining, and testing the Defendant's security protocols to ensure that individuals' PII and PHI in Magellan's possession was adequately secured and protected and that employees tasked with maintaining such information were adequately trained on cybersecurity measures regarding the security of such information.

90.     Plaintiffs and the Class members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew of or should have known of the inherent risks in collecting and storing PII and PHI of Plaintiffs and the Class, the critical importance of providing adequate security of that PII, the current cyberscams being perpetrated, and that it had inadequate employee training and education and IT security protocols in place to secure the PII and PHI of Plaintiffs and the Class.

91.     Defendant's own conduct created a foreseeable risk of harm to Plaintiffs and Class members. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included its decision not to comply with industry standards for the safekeeping and encrypted authorized disclosure of the PII of Plaintiffs and Class members.

92.     In addition, Section 5 of the FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Magellan, of failing to use reasonable measures to protect PII.  The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

93.     Magellan violated Section 5 of the FTCA by failing to use reasonable measures to protect employees' and providers' PII and not complying with applicable industry standards, as described in detail herein. Magellan's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiffs and Class members.

94.     Plaintiffs and the Class members had no ability to protect their PII and PHI that was in Magellan's possession.

95.     Defendant was in a position to protect against the harm suffered by Plaintiffs and Class members as a result of the Data Breach.

96.     Defendant had a duty to put proper procedures in place in order to prevent the unauthorized dissemination of Plaintiffs' and Class members' PII and PHI.

97.     Defendant admitted that Plaintiffs' and Class members' PII and PHI was wrongfully disclosed to unauthorized third persons as a result of the Data Breach.

98.     Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class members by failing to exercise reasonable care in protecting and safeguarding the Plaintiffs' and Class members' PII and PHI while it was within the Magellan's possession or control.

99.     Defendant improperly and inadequately safeguarded Plaintiffs' and Class members' PII and PHI in deviation of standard industry rules, regulations and practices at the time of the Data Breach.

100.    Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class members by failing to have appropriate procedures in place to detect and prevent dissemination of its employees', providers' and patients' PII and PHI.

101.    Defendant, through its actions and/or omissions, unlawfully breached its duty to timely and adequately disclose to Plaintiffs and Class members the existence, and scope of the Data Breach.

102.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and Class members, Plaintiffs' and Class members' PII and PHI would not have been compromised.

103.    There is a temporal and close causal connection between Defendant's failure to implement security measures to protect the PII and PHI and the harm suffered, or risk of imminent harm suffered by Plaintiffs and the Class.

104.    As a result of  Defendant's negligence, Plaintiffs and the Class members have suffered and will continue to suffer damages and injury including, but not limited to: out-of-pocket expenses associated with procuring robust identity protection and restoration services; increased risk of future identity theft and fraud, and the costs associated therewith; time spent monitoring, addressing, and correcting the current and future consequences of the Data Breach; and the necessity to engage legal counsel and incur attorneys' fees, costs and expenses.

## SECOND CAUSE OF ACTION
## BREACH OF IMPLIED CONTRACT

105.    Plaintiffs restate, reallege and incorporate by reference all preceding paragraphs, as if fully set forth herein.

106.    Plaintiffs and Class members were required to provide their PII and PHI, including their names, Social Security numbers, addresses, medical record numbers, dates of birth, telephone numbers, email addresses, and various other sensitive information to Defendant as a condition of their employment, of receiving employment benefits or of contracting with Magellan and/or receiving health plan benefits.

107.    In its written privacy policies, Magellan expressly promised Plaintiffs and Class members that it would only disclose PII and PHI under certain circumstances to authorized third parties, none of which relate to the Data Breach.

108.    Implicit in the agreement between Plaintiffs and Class members and the Defendant to provide PII and PHI, was the latter's obligation to: (a) use such information for business purposes only; (b) take reasonable steps to safeguard that information; (c) prevent unauthorized disclosures of both PII and PHI; (d) provide

Plaintiffs and Class members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII and PHI; (e) reasonably safeguard and protect the PII and PHI of Plaintiffs and Class members from unauthorized disclosure or uses; and (f) retain the PII and PHI only as long as necessary and under conditions that kept such information secure and confidential.

109.   Without such implied contracts, Plaintiffs and Class members would not have provided their PII and PHI to Defendant until such time that Defendant could properly safeguard that information.  In addition, Plaintiffs and Class members would not have accepted any form of employment, association or benefits with Magellan until such time as Magellan could guarantee that their PII and PHI would be adequately secured and protected against disclosure.

110.   Plaintiffs and Class members fully performed their obligations under the implied contract with Defendant, however, Defendant did not.

111.   Defendant breached the implied contracts with Plaintiff and Class members by failing to, *inter alia*:

      a.  Reasonably safeguard and protect Plaintiffs' and Class members' PII and PHI, which was compromised as a result of the Data Breach;

      b.  Ensure the confidentiality and integrity of electronic protected information Defendant created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

      c.  Implement technical policies and procedures for electronic information systems that maintain electronic PII and PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

d.  Implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1);

e.  Identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 C.F.R. § 164.308(a)(6)(ii); and

f.  Protect against any reasonably anticipated threats or hazards to the security or integrity of electronic information, in violation of 45 C.F.R. § 164.306(a)(2).

## THIRD CAUSE OF ACTION
### UNJUST ENRICHMENT

112.  Plaintiffs restate and reallege and incorporate by reference all preceding paragraphs, as if fully set forth herein.

113.  Plaintiffs and Class members conferred a benefit on Defendant by agreeing to work for Magellan and to further Magellan's financial interest and performance. Specifically, by becoming employees and providers within Magellan, the Plaintiffs and Class members provided services to Magellan upon which it received payment from unrelated third parties In exchange, Plaintiffs and Class members should have received the benefit of Magellan's commitments to safeguard PII with adequate data security.

114.  Further, Defendant enriched itself by the savings on expenses related to data security measures to safeguard the PII in its possession.  In lieu of providing a reasonable and adequate level of security for its industry, Defendant saved money and increased profits by utilizing ineffective, and somewhat cheaper, security measures.

115.   Defendant knew that Plaintiffs and Class members conferred benefits which Defendant accepted. Defendant thus profited from these transactions and used the PII and PHI of Plaintiffs and Class members to further its business purposes.

116.   The amounts Magellan received on behalf of the work completed by its employees and providers were used, in part, to pay for use of Magellan's network and the administrative costs of data management and security.

117.   Under the principles of equity and good conscience, Defendant should not be permitted to reap such benefits because Defendant failed to implement appropriate data management and security measures.

118.   Defendant acquired the Plaintiffs' and Class members' PII and PHI through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

119.   Plaintiffs and Class members have no adequate remedy at law.

120.   As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII and PHI are used; (iii) the compromise, publication, and/or theft of their PII and PHI; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII and PHI; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII and PHI, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII and PHI in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the

PII and PHI compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class members.

121.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have suffered and will continue to suffer other forms of injury and/or harm.

122.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class members, proceeds that they unjustly received from them.

**FOURTH CAUSE OF ACTION**
**ARIZONA CONSUMER FRAUD ACT ("ACFA")**
**Ariz. Rev. Stat. §§ 44-1521, *et seq.***

123.    Plaintiffs restate and reallege and incorporate by reference all preceding paragraphs, as if fully set forth herein.

124.    The ACFA provides in pertinent part:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in face been misled, deceived or damaged thereby, is declared to be an unlawful practice.

*Id.* § 44-1522.

125.    Plaintiffs and Class members are "persons" as defined by Ariz. Rev. Stat. § 44-1521(6), Magellan provides "services" as that term is included in the definition of "merchandise" under Ariz. Rev. Stat. § 44-1521(5), and Magellan is engaged in the "sale" of "merchandise" as defined by Ariz. Rev. Stat. § 44-1521(7).

126.    Magellan engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression and omission of material facts

in connection with the sale and advertisement of "merchandise" (as defined in the ACFA) in violation of the ACFA, including but not limited to the following:

    a.  Failing to maintain sufficient security to keep Plaintiffs' and Class members' confidential financial and personal data from being hacked and stolen;

    b.  Misrepresenting material facts, pertaining to maintaining adequate data privacy and security practices and procedures to safeguard Class members' PII and PHI from unauthorized disclosure, release, data breaches, and theft;

    c.  Misrepresenting material facts, by representing that it did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Class members' PII and PHI;

    d.  Omitting, suppressing, and concealing the material fact of the inadequacy of the privacy and security protections for Class members' PII and PHI;

    e.  Engaging in unfair, unlawful, and deceptive acts and practices by failing to maintain the privacy and security of Class members' PII and PHI, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Magellan Data Breach. These unfair, unlawful, and deceptive acts and practices violated duties imposed by laws; and

    f.  Engaging in unlawful, unfair, and deceptive acts and practices by failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Class

members' PII and PHI from further unauthorized disclosure, release, data breaches, and theft.

127.    The above unlawful, unfair, and deceptive acts and practices by Magellan were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and Class members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

128.    Magellan knew or should have known that its computer systems and data security practices were inadequate to safeguard Class members' PII and PHI and that risk of a data breach or theft was high. Magellan's actions in engaging in the above-named deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Class.

129.    As a direct and proximate result of Magellan's deceptive acts and practices, the Class members suffered an ascertainable loss of money or property, real or personal, as described above, including the loss of their legally protected interest in the confidentiality and privacy of their PII and PHI.

130.    Plaintiffs and Class members seek relief under the ACFA including, but not limited to, injunctive relief, actual damages, treble damages for each willful or knowing violation, and attorneys' fees and costs.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request the following relief:

       a.  An Order certifying this case as a class action;

       b.  An Order appointing Plaintiffs as the class representatives;

       c.  An Order appointing undersigned counsel as class counsel;

d. An Order compelling Defendant to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class members, proceeds that they unjustly received;

e. A mandatory injunction directing Defendant to adequately safeguard Plaintiffs' and Class members' PII and PHI by implementing improved security procedures and measures;

f. An award of damages;

g. An award of costs and expenses;

h. An award of attorneys' fees; and

i. Such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial as to all issues triable by a jury.

DATED this 8th day of July 2020.

BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.

By *Carrie A. Laliberte*

Elaine A. Ryan (AZ Bar #012870)
Carrie A. Laliberte (AZ Bar #032556)
2325 E. Camelback Rd., Suite 300
Phoenix AZ 85016
Telephone:    (602) 274-1100
eryan@bffb.com
claliberte@bffb.com

Patricia N. Syverson (AZ Bar #020191)
BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.
600 W. Broadway, Suite 900
San Diego, California 92101
Telephone:    (619) 798-4593
psyverson@bffb.com

As local counsel for:

John A. Yanchunis*
Patrick A. Barthle*
MORGAN & MORGAN
COMPLEX LITIGATION
GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida  33602
Telephone:  (813) 223-5505
jyanchunis@forthepeople.com
pbarthle@forthepeople.com

Joel R. Rhine*
Martin A. Ramey*
RHINE LAW FIRM, P.C.
1612 Military Cutoff Rd., Suite 300
Wilmington, NC 28403
Telephone:  (910) 772-9960
jrr@rhinelawfirm.com
mjr@rhinelawfirm.com

Michael Dell'Angelo*
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA  19103
Telephone: (215) 875-3000
mdellangelo@bm.net

Michael K. Yarnoff*
Kehoe Law Firm, P.C.
Two Penn Center Plaza
1500 JFK Boulevard, Suite 1020
Philadelphia, PA 19102
Telephone: (215) 792-6676
myarnoff@kehoelawfirm.com

Counsel for Plaintiff and the
Putative Class

*Motions for *pro hac vice*
admission to be filed